IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
───────────────────────────────────────────────────────────

DONALD L. THRELKELD,

                Plaintiff,                      OPINION & ORDER

    v.                                                    12-cv-077-wmc

SMURFIT STONE,

                Defendant.
───────────────────────────────────────────────────────────

In this proposed civil action, plaintiff Donald L. Threlkeld brings claims against his former employer, Smurfit Stone, under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Threlkeld has been granted leave to proceed under the *in forma pauperis* statute, 28 U.S.C. § 1915, and has prepaid his initial partial filing fee of $175.00. The next step is determining whether Threlkeld's proposed action: (1) is frivolous or malicious; (2) fails to state a claim on which relief can be granted; or (3) seeks money damages from a defendant who is immune from such relief. Because Threlkeld has failed to demonstrate that any of the harassment he alleges was predicated upon his race, color, religion, sex or national origin, he has failed to state a claim under Title VII. Accordingly, the court must dismiss his suit.

ALLEGATIONS OF FACT

In addressing a *pro se* litigant's pleadings, the court must read the allegations generously. *Haines v. Kerner*, 404 U.S. 519, 521 (1972). For the purposes of this order, the court accepts the plaintiff's well-pled allegations as true and assumes the following facts:

Donald Threlkeld began work for Smurfit Stone ("Smurfit") on April 4, 2005. The corrugated box industry in which Smurfit competes was new to Threlkeld and Smurfit offered no formal training. Threlkeld was nevertheless quickly promoted from his initial position on Press 127 to a more difficult job in the corrugator area, where the work was fast-paced and Threlkeld was required to perform a variety of different duties. At some point thereafter, Corrugator Supervisor Cliff Cross informed Threlkeld he needed to learn to operate a machine in a different area of the plant due to another employee's upcoming vacation. Upon beginning work in that new position, however, Threlkeld was chastised and cursed for his lack of knowledge. When he asked questions or requested assistance regarding his new duties, he was refused. Cross brought Threlkeld into a meeting sometime afterward, and Threlkeld was told he was to be transferred to another machine, operated by Dan Larson, and disqualified from his current position.

When Threlkeld was transferred, he was again placed in his new position without training and chastised for his inexperience. Larson even spat in his face and yelled at him when he was unhappy with Threlkeld's performance. Upon reporting the spitting incident to Production Supervisor Tom Pangburn, he was told that nothing would be done. Immediately thereafter, Threlkeld was informed he was to be disqualified from the new machine as well. Cross also forced Threlkeld to sign paperwork stating that he was disqualified from the corrugator area before he could apply for a transfer to Press 123.

At Press 123, Threlkeld spoke with its current operator, Carl Schwartzenberg, who stated that he was aware of all the harassment Threlkeld had endured and that such treatment would not occur at Press 123, since everyone there worked as a team. Threlkeld

received awards for his great productivity while at Press 123. In or around May 2007, Threlkeld transferred to Press 122.

At Press 122, Threlkeld again began to experience problems with coworkers. Whenever operator Darren Baggs would go on break, Bridget Cox (presumably one of Threlkeld's Press 122 teammates), would leave to converse with other coworkers and would only return immediately before Baggs did. Her absence left the area shorthanded and the machine unmanned, so Threlkeld reported her behavior to Baggs. Baggs in turn reported it to his own supervisor, Derek Freeman, who called a meeting with Cox, Threlkeld, and union steward Clayton Lamont. At the meeting, Threlkeld was informed that Cox and he "just needed to get along," that they should "work as a team," and that they should "just forget about this incident." He was also made aware that Cox's behavior was not uncommon and that he should expect it to continue. After about three months at Press 122, Threlkeld chose to apply for a position in shipping.

The problems that Threlkeld had been facing at work only worsened after the transfer to shipping, which caused him "great distress on a daily basis." Threlkeld was also not trained for his position when he arrived, because the shipping supervisor was on medical leave at the time. When he sought out two other forklift drivers in shipping, John Ellen and Kim Ceplina, they provided conflicting information and then became upset with him when he was uncertain how to proceed. Both Ellen and Ceplina instructed him to proceed in particular ways and then, upon changing their minds, reported him to the office for following their initial instructions.

Ceplina also frequently made his work environment extremely difficult in a variety of other ways. For example, she provided him with reference sheets but then told him he was

3

incorrect for following those instructions; she told him to take initiative in making decisions and then reported him when he did so; and she verbally abused him by using vulgar language and expletives. On one occasion, Ceplina swore at him multiple times and then went to the office of Plant Superintendent Tom Pangburn, presumably to complan. When Threlkeld followed and explained what had happened, Pangburn told Ceplina, who admitted using the expletive, that she could get into trouble for such behavior and language, and told them both that they "should go back to work and just get along."

From that point on, both Ellen and Ceplina ensured that Threlkeld was written up for "every little thing" he did. This resulted in five write-ups in just six weeks, which damaged his personnel record. A meeting was then called with Pangburn, Supervisor Dan Cox, Union President Leo Lynch, Union Representative Ryann, and Threlkeld. Lynch informed Threlkeld that the union and Smurfit had agreed (1) to disqualify him from shipping, and (2) if he did not sign a posting and apply for a different position, then he would be "outside looking in." Pangburn and Lynch urged Threlkeld to sign the posting and apply for Press 143. In a private conversation, Lynch declined to answer Threlkeld's questions and repeated that this was what he and Pangburn "felt was best." Threlkeld then agreed to sign the posting, saying that he "ha[d] no choice." On the advice of a coworker, Threlkeld also spoke to Sandra Kaehn in Human Resources, but she never got back to him.

Threlkeld then transferred to Finishing Press 143, where he worked with Bonnie Lynch and Barbie Parkinson. Both Bonnie Lynch and Parkinson refused to answer his questions, responding instead with profanities, insults and brushoffs, and ran the press too fast for Threlkeld to keep up with it, which led to further write-ups. Carrie, a forklift driver, repeatedly tried to hit Threlkeld with her forklift; at one point, she flung a garbage can at

4

him, which clipped the back of his leg. When he asked her to be more careful, she swore at him and drove away laughing. When Threlkeld reported that incident, he was told that it was his own fault, because he had not been within the unmarked, three-foot designated walkway area.

Pangburn thereafter sent Threlkeld to "quality" school with two new hires, instructed by Quality Manager Matt Schlinkert; to Threlkeld's knowledge, this was the only time such a "quality" school was ever held  At the training, Threlkeld discovered that the company administrators intended to persecute him until they had grounds to terminate him. Schlinkert stated that, as head of quality control, he had never had issues with Threlkeld's work, and that he understood what Threlkeld was going through, as he had gone through a similar ordeal at a previous job.

Due to the incidents at Press 143, Threlkeld moved to Press 144. Operator Cheryl Zaucha stated that she was aware of the occurrence on Press 143, but that she knew he was a good worker. After about one month, Production Supervisor Dan Cox informed Threlkeld he no longer needed to have employee progress reports completed due to good performance. However, Smurfit then began phasing out Press 145, which required shifting employees downward by one position. As third assistant, Threlkeld could not be shifted to a different position on Press 144, so he had to apply for a position driving a forklift and moving or "pushing" stock.

Upon his move to the stock pushing department, Threlkeld again began experiencing problems. One forklift operator, Scott, used his radio, meant for communication with other departments, to yell at Threlkeld. Threlkeld was also moved from a forklift to a smart cart. On one occasion, Threlkeld had completed an order on Press 137 and begun work on

5

another order, when Production Supervisor Chris Lessig yelled at him for putting the order on the line before Threlkeld had a chance to explain that the order was complete. Soon afterward, Plant Manager Brian Clark inquired about Threlkeld's job performance, upon which a coworker on Press 122, Michelle Reeves, informed Clark that Threlkeld fell behind occasionally but did "a lot better than most." Within two days of this inquiry, Threlkeld was disqualified from the stock pushing position, ostensibly because he was "not fast enough" and "was not doing [his] job properly," and sent to Press 137.

After two apparently uneventful weeks on Press 137, Pangburn informed Threlkeld that someone with senioriy wanted the position and that he would be transferred elsewhere. He was moved to Order Prep for Presses 122 and 123 on September 19, 2009, but these positions were quickly made unassigned positions, and he was transferred again to Order Prep for Press 118 and Family Relations Press 127 as third helper. On January 8, 2010, he was assigned third helper for Press 127. In that role, another coworker, Judith Deeke, treated him with hostility, making comments like "I'm not going to be your babysitter" and "Stay the [expletive] away from me." She also refused to answer his questions about his job. In one incident on or about April 16, 2010, Deeke requested that Threlkeld bring her the load tags she needed. When he could not find them, Deeke swore at him and gave him more specific instructions. Threlkeld still could not find them, but when he told Deeke, she said, "I didn't say [expletive] load tags, I said die cuts." She then struck him, causing him to lose his balance and fall. Threlkeld got up and told Deeke they needed to talk, to which she responded, "I'm not [expletive] talking to you, stay the [expletive] away from me."

Threlkeld reported the incident to his supervisor, Beth Probyn, who called a meeting with Deeke and Threlkeld. After being asked to wait in a different office while Probyn

6

spoke to Deeke, Threlkeld was then admitted. Union steward Jim Miller was also present and stated that Deeke had admitted to her wrongdoing. Miller also said later that it was Deeke's fourth offense of a similar nature and that she was being suspended for three days. Threlkeld was then instructed to return to work and to report to Stevie Cross, who again began to cause work problems for Threlkeld. For instance, on or about April 19, 2010, Cross instructed Threlkeld to take his lunch break. He did so, taking a break of about 21 minutes, before returning to the press. Threlkeld ran into Probyn, who asked where he had gone and then informed him that Cross had reported him as having been gone between 45 minutes and an hour. Threlkeld asked Cross why she had made such a report, stated he had not been gone that long, and told her she was "in no position to say anything" since she had taken a break of over an hour the previous Friday. Cross "began yelling at the top of her lungs" and told Threlkeld, "[g]o take a [expletive] two hour break if you want."

      Threlkeld reported this incident to Probyn, who asked him to come to the office with Miller. Because this was the second incident on the press within two days, both Probyn and Miller advised that Threlkeld would have to be suspended pending further investigation. Threlkeld felt this was unfair and believed it to be the result of Probyn's friendship with Deeke (and, presumably, bitterness over Deeke's suspension). Miller told him to "take it like a vacation" and that the union would file a grievance. No such grievance was ever filed.

      After two weeks with no word, Threlkeld called the union and was told that Miller would get in touch. Miller did call after that, but only to inform Threlkeld that he was going on vacation and someone else would handle the situation. On May 6, 2010, Threlkeld received a call from Mike Kiiskila, informing him of a meeting with Clark, Kaehn, Union Representative Matt, and Irma Dorame the following day. At that meeting, Clark

7

read the findings of his investigation: that Threlkeld could not work with women and that he would need to sign a form and attend counseling, otherwise the company would "take it as a voluntary quit." Threlkeld refused to quit his job and asked the union steward what could be done. Clark again stated, "Either sign this paper and go back to work with the two girls on Press 127 or I'll take it as a voluntary quit." Kaehn reminded Threlkeld that if he went back to work on Press 127, he would be fired if his coworkers had the "slightest problem" with him. Threlkeld responded that she knew "how these women are and what they did to [him.]"

For a third time, Clark demanded that Threlkeld sign the paper or voluntarily quit. Again, Threlkeld stated that he would not quit his job and that the only way he would leave was if he was fired. Clark then became angry and said, "I'm done with you, you're out of here, so go get your [expletive] and leave now." Threlkeld told Matt he wanted to file a grievance, and Matt said he would do so and walked Threlkeld to his vehicle. On May 4, 2010, however, Threlkeld was instead dropped from the union.

Threlkeld brings claims based on the threatening behavior, verbal abuse and physical attacks he suffered during his time at Smurfit. He states he was "harassed and made to feel less than a man," and alleges that Smurfit's goal was to ensure his work record was bad so that they could eventually terminate him. He seeks monetary damages, as well as a written apology from Smurfit and the union.

OPINION

Threlkeld's central claim appears to be one of a hostile work environment under Title VII of the Civil Rights Act, which states in relevant part:

8

> It shall be an unlawful employment practice for an employer –
>
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a)(1). This language "evinces a congressional intent 'to strike at the entire spectrum of disparate treatment of men and women' in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986)).

While conduct must be more than "merely offensive" to state a hostile work environment claim, it need not rise to the level of "caus[ing] a tangible psychological injury." *Id.* at 21. Nor need the work environment be "hellish" before a Title VII suit can succeed. *Jackson v. County of Racine*, 474 F.3d 493, 500 (7th Cir. 2007). Instead, it is necessary only that "the environment would reasonably be perceived, and is perceived, as hostile or abusive." *Harris,* 510 U.S. at 22. Factors to consider in the analysis may include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.*

The court infers from the facts pled that Smurfit is an "employer" within the meaning of Title VII. *See* 42 U.S.C. § 2000e(b). Threlkeld also alleged that (1) he perceived the working environment as hostile and abusive, (2) he was treated with hostility directly to his face and (3) it caused him significant distress both at work and at home. Additionally, Threlkeld has alleged enough specific facts to make plausible -- based on the

9

factors enumerated in *Harris* -- defendant's claim that the environment at Smurfit would reasonably be perceived as hostile and abusive.  For instance, he has alleged the hostile conduct was:  (1) frequent, at times occurring on a daily basis; (2) sometimes physically threatening (such as when Deeke struck him, or when Carrie attempted to hit him with a forklift); (3) humiliating (such as when Larson spit in his face); and (4) severely interfered with his work performance, resulting in numerous transfers to work areas with which he was not familiar and was denied instruction on how to do his job properly despite repeated requests for training.

What Threlkeld has *not* alleged, however, is that the hostility he describes was caused by his membership in any of the protected classes specified in Title VII.  He has alleged no facts at all surrounding his race, color, religion or national origin or suggesting that the treatment he endured at Smurfit was connected to one of those; the only possibility remaining, then, is that Threlkeld intended to allege sex discrimination.  This is certainly possible since Title VII protects men, as well as women, from discrimination on the basis of their sex.  *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998).

To establish a prima facie case of sex discrimination based on a hostile work environment, however, a plaintiff must show not only the kind of "objectively offensive" behavior described above but also "the link between this treatment and [his] sex." *Jackson*, 474 F.3d at 499.  This is because "Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at '*discriminat[ion]* . . . because of . . . sex." *Oncale*, 523 U.S. at 80 (emphasis and alterations in original).  Thus, the "critical issue . . . is whether members of one sex are exposed to disadvantageous terms or conditions of

employment to which members of the other sex are not exposed." *Id.* (quoting *Harris*, 510 U.S. at 25).

It is here that Threlkeld's pleading falls apart. While he does allege that his ultimate termination was supposedly premised on a finding that he "could not work with women," and that throughout the time in question he was "made to feel like less of a man," he never indicates that any of the alleged hostility with which he was treated was based on his sex. Nor do the alleged facts support such an assumption: he does not allege he was "harassed in . . . sex-specific and derogatory terms," for example, nor does he offer "direct comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace." *Id.* at 80-81. Ultimately, while Threlkeld has without doubt painted a vivid picture of a hostile, toxic work environment, he has failed to allege, or even to intimae, the critical link between that environment and his sex.

Though the court is sympathetic to the distress Threlkeld has suffered, Title VII is not "a general civility code for the American workplace." *Id.* at 80. Without some allegation that the conduct of Smurfit's employees was discrimination *because of* his sex (or because of another characteristic protected by Title VII), Threlkeld has not stated a claim based on a hostile work environment under 42 U.S.C. § 2000e.

This deficiency in Threlkeld's allegations applies with the same force to any other claims under Title VII he may have wished to pursue. For example, to the extent that Threlkeld has attempted to state a claim for discriminatory discharge under 42 U.S.C. § 2000e-2(a)(1), he has failed to allege that his discharge was because of his sex; indeed, Threlkeld's pleadings suggest his discharge was *not* the result of sex discrimination, but was

11

instead the result of a personal vendetta that Smurfit administrators had against him personally.

To the extent that Threlkeld has attempted to state a claim for sex discrimination based on the various potential adverse employment actions he alleges (such as the transfers to which he was subjected, his disqualification from various work areas and his eventual suspension), his pleadings suffer from the same deficiency. He neither alleges discriminatory intent based on sex, as required by the direct method for pleading sex discrimination, *see Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 646 (7th Cir. 2005), nor does he allege that he performed his job satisfactorily but was treated less favorably than similarly-situated women, as required by the indirect method. *See Spearman v. Ford Motor Co.*, 231 F.3d 1080, 1087 (7th Cir. 2000) (to state a prima facie case of sex discrimination via indirect method, male plaintiff had to show that he belonged to a protected class, performed his job successfully, suffered an adverse employment action and was treated less favorably than similarly situated female employees).

Because Threlkeld has failed to allege any facts allowing the court to infer that Smurfit took particular actions against him *because of his sex*, he has failed to state a claim for which relief can be granted under Title VII. This court will, therefore, dismiss the case pursuant to 28 U.S.C. § 1915.

ORDER

IT IS ORDERED that Plaintiff's motion for leave to proceed is DENIED, and plaintiff's complaint is dismissed for failure to state a claim upon which relief may be granted.

Entered this 20th day of December, 2013.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge